**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | : | |
| COMMISSION, | : | |
|     Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
|     v. | : | 1:08-CV-0294-WBH |
| | : | |
| ROBERT F. GRUDER, et al., | : | |
|     Defendants. | : | |

## ORDER

In the February 11, 2010, Order, [Doc. 88], (hereinafter the "February Order") this Court discussed the facts established by the Government at the trial and identified and discussed the legal standards to apply to the Government's claims. Based on this Court's analysis of those standards in light of the facts, this Court found in favor of Defendant Gruder on the Government's NASDAQ Claim and ATF Claim. For the purposes of this discussion, this Court adopts the factual summary, legal discussion and defined terms set forth in the February Order.

With respect to the remaining product readiness claims, it is important to point out that, in the February Order, this Court found that,

> given the evidence presented by the Government, this Court is not convinced that, as of the time that Defendant issued the January 4, 2005, press release, that Defendant did not reasonably believe that there was a good chance that a stun gun would be ready at some point in the next few months. After that press release, Defendant did not make any more claims regarding shipping product in the first quarter of 2005.

[Id. at 19].

AO 72A
(Rev.8/8
2)

Accordingly, this Court has held that the Government failed to demonstrate scienter with respect to the product readiness statements made in Stinger press releases up to the January 4, 2005, release, and as such, this Court has concluded that Defendant did not violate any securities law as to those releases. The only matters left for consideration are the matters with respect to which this Court invited further briefing in the February Order: (1) whether Defendant's failure after January, 2005, to inform investors that his earlier production and shipping predictions would not be met was material and what remedy would be appropriate for such a violation and (2) whether the Government presented evidence that would support a finding that production of stun guns did not commence on or around March 21, 2005, such that there is a basis upon which to find that Defendant lied when he issued a press release on that date announcing the start of production.

## Discussion

In its brief, the Government dedicates substantial discussion to matters well beyond the questions about which this Court invited further briefing. Generally, this Court will not consider matters that were either settled by the February Order or are irrelevant to the remaining disputes at issue. This Court will, however, address certain of the Government's extraneous arguments so as to complete the record.

2

AO 72A
(Rev.8/8
2)

In response to the Government's arguments relating to this Court's statement in the February Order noting the absence of "evidence which clearly indicates that Defendant absolutely knew that it was impossible to produce a stun gun in the first quarter of 2005," [Doc. 88 at 19], this Court is aware that circumstantial evidence can be used to demonstrate that Defendant knew or should have known that his projections were not possible. However, under the evidence presented by the Government and in making the type of credibility determinations among witnesses required in its role as the finder of fact, this Court found that, as late as January 4, 2005, there was a reasonable basis for Defendant to believe that Stinger could ship its stun gun product by the end of the first quarter or early in the second quarter of 2005. It was in this context that this Court noted the absence of "smoking-gun" type evidence and that such evidence was the only thing that could have saved the Government's claim.

Additionally, this Court deems it necessary to discuss the Government's extensive arguments regarding witness Roy Cuny. While Mr. Cuny's testimony regarding product readiness was certainly relevant and worthy of consideration, this Court sees no reason to attribute to Mr. Cuny the voice-of-God infallibility that the Government seemingly ascribes to him. More importantly, Defendant has repeatedly pointed out that Defendant made no statements regarding shipment of stun guns in the first quarter of 2005 after the January 4, 2005, press release, and the Government has

3

not disputed that fact. As Mr. Cuny did not start working at Stinger until January 5, 2005, nothing he said or did could have had any effect on the reasonableness of Defendant's belief with respect to any of Defendant's shipping-in-the-first-quarter statements.

This Court is further unpersuaded by the Government's arguments regarding witness Yates Exley's testimony. As the Government's own summary of Mr. Exley's emails, [Doc. 93 at 21-22], and a review of Mr. Exley's testimony demonstrates, it appears that Mr. Exley was working feverishly to get a stun gun product manufactured as quickly as possible, and both he and Defendant were disappointed by their vendor's inability to complete the product. While there were obvious problems with completing the stun gun, nothing in the Exley emails or testimony indicates that, in early January, 2005, Exley thought that first quarter production of the stun gun was unreasonable.

Finally, in response to the Government's repeated reference to Defendant's press release claims that Stinger "had entered the stun gun market" and that Stinger was "actively selling" stun guns, this Court reads those statements to mean what they say: Stinger planned to sell stun guns and was contacting potential customers. If a press release states (or the "total mix" of press releases state) that Stinger *will be* shipping stun guns sometime in the future, then statements about *having entered the market* and *actively selling stun guns* have to be read in the context of the fact that there are not yet

4

any stun guns.  To do otherwise would necessitate ascribing to "reasonable investors" a judgment level to low to make investment decisions.

The March 21, 2005 Press Release and the Start of Production

Turning now to the question of whether the Government presented evidence that would support a finding that there was no production on or around March 21, 2005, having reviewed the Government's response, it is clear that the answer is no – the Government presented no such evidence.  The Government did present evidence that might tend to indicate that production began in a limited fashion and then quickly halted.  The Government also presented evidence that, even years later, Stinger had not yet produced a workable stun gun in volume.  However, when looking at the March 21, 2005, press release in the context of what Defendant knew at that time, the Government has failed to establish by a preponderance of the evidence that Defendant's announcement of the beginning production was a misrepresentation at the time that it was made.  In response to the Government's argument that extremely limited production is not production sufficient to make the press release true, this Court first responds that the Government has not presented any evidence upon which this Court can reliably determine how limited the production was.  All that we can surmise from what the Government presented is that not a great many units were produced, but

we do not know how few.  More importantly, even if the production was extremely limited, this Court would not necessarily consider the language in the press release a misrepresentation.  As the evidence presented at the trial established, Stinger was not itself manufacturing the stun guns but relied on outside vendors to make the guns.  As such, a very reasonable interpretation of the evidence presented by the Government is that a vendor informed Defendant that the production run had begun, Defendant then announced the start of production, and later, perhaps the next day, the vendor handling the production called Defendant to tell him that the production had halted because of some unanticipated problem.  Under this interpretation, when Defendant issued the press release, it was entirely true, and given the evidence presented, this interpretation is just as likely as any other.

The Government has failed to present, and this Court thus has no reliable idea of (1) how many stun guns were made at the time, (2) how many parts of stun guns were made, (3) why production halted, (4) whether Stinger's vendor thought that the problems causing the stoppage could be resolved quickly, or (5) what Stinger's vendor told Defendant and when.  These are all matters that bear on the question of whether Defendant was lying at the time he drafted the press release, and with the paucity of evidence, the Government simply cannot make its case.

AO 72A
(Rev.8/8
2)

In summary, this Court finds that the Government has failed to establish that Defendant violated § 10(b) or Rule 10b-5 with respect to the March 21, 2005, press release.

Materiality of Defendant's Failure to Update Production Schedule

In the February Order, this Court noted that even though the Government had not established scienter regarding Defendant's statements regarding shipping the Stinger stun gun in the first quarter of 2005, at some point it must have become obvious to Defendant that his publicly-announced production schedule would not be met. The Government argued during the trial that Defendant then had a duty to make some form of corrective statement so as not to leave information which turned out to be incorrect in the marketplace. Given the fact that the Stinger share price had already tanked – or at least had begun to tank – by the time that Defendant could have made a corrective statement, this Court at first wondered whether Defendant's failure to make a statement would have been material. Having further reflected on the fact that the Government raised this argument for the first time during the trial, this Court feels that fairness demands that it must consider Defendant's arguments that no duty to clarify the production schedule ever arose.

7

As indicated by Defendant's argument, an omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). "The total mix of information includes all information reasonably available to the shareholders . . . ." Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc., 412 F.3d 103, 110 (2d Cir. 2005) (citations and quotations omitted).

"The role of the materiality requirement is not to attribute to investors a child-like simplicity, . . . but to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision." Basic Inc. v. Levinson, 485 U.S. 224, 234 (1988) (quotations and citations omitted). In particular, courts have on occasion granted Rule 10b-5 Defendants significant leeway with respect to predictions regarding product release/readiness dates or the completion of projects, which predictions later turn out to have been overly optimistic. E.g., Hillson Partners Ltd. Partnership v. Adage, Inc., 42 F.3d 204, 213 (4th Cir. 1994) ("A 'reasonable investor' knows that a capital improvement project may run into unforeseen problems and delays and would not have considered a statement explaining this to have been 'significant.'"); Borow v. nVIEW Corp., 829 F. Supp. 828 (E.D. Va. 1993) ("Where

AO 72A
(Rev.8/8
2)

. . . a product is understood to be in development, plaintiff may not assert merely that, because the project did not come out when projected, plans for an earlier release were false."); see also Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 515 (7th Cir. 1989) ("Issuers need not 'disclose' Murphy's Law or the Peter Principle, even though these have substantial effects on business.").

Accordingly, this Court concludes that Defendant's duty to disclose the fact that, contrary to his earlier statements, Stinger would not be shipping its stun guns in the first quarter of 2005, was, at most, limited.  Given the fact that, as Defendant points out, in its February 7, 2005, Form S-1, Stinger announced that it could not "provide definitive assurances of when the Stinger Stun Gun will actually be commercially available,"  [Plaintiff's Exh. 96 at 24],[1] this Court concludes that either Defendant

---

[1] This Court further notes that, in Stinger's May 25, 2005, Form S-1 the company disclosed that:

> After producing numerous versions of the Stinger projectile stun gun, the Company began limited production on March 20, 2005.

> Inefficiencies discovered in the design hampered production and required correction before volume commercial production could commence. These inefficiencies included the mold design, electronics design, camera mount, design of the ammunition cartridges, internal packaging and numerous assembly issues.

> Working with outside engineering firms, the Company is addressing each of these issues and currently believes, based on preliminary internal product tests, that it may begin volume commercial production and

9

AO 72A
(Rev.8/8
2)

made a corrective statement in the Form S-1 or, under the "total mix" of information available to investors, the failure of Defendant to issue some form of corrective press release was not material.

In response to the Government's argument that the statements in the February 7, 2005, Form S-1 were inconsistent with the information in the press releases, this Court again points to the undisputed fact that Defendant's last statement regarding shipment in the first quarter of 2005 was contained in the January 4, 2005, press release. Accordingly, as the Form S-1 came out a month later, this Court finds that a reasonable investor would conclude that the later statement corrects the earlier statement rather than contradicts it. Indeed, it is impossible to miss the irony in the fact that the Government first argues that a corrective statement was required, but when Defendant points out a corrective statement, the Government then starts arguing about inconsistencies.

---

shipment of the Stinger late in the second quarter or third quarter of 2005.

While the Company is encouraged with results of numerous internal tests conducted on the Stinger to date, final testing of the product can only be conducted once production commences. It may be the case that further modifications of the Stinger will be required before commercial shipments of the Stinger are possible. As a result, the Company can give no definitive assurances that it will begin commercial production at the end of the second quarter or third quarter of 2005.

[Plaintiff's Exh. 139, at 22].

AO 72A
(Rev.8/8
2)

Accordingly, this Court concludes that the Government has failed to establish a § 10(b) or Rule 10b-5 violation arising out of Defendant's failure to correct his earlier statements regarding shipping stun guns in the first quarter of 2005.

### Conclusion

For the foregoing reasons and the reasons discussed in the February Order, this Court concludes that the Government has failed to establish that Defendant violated § 10(b) or Rule 10b-5. Accordingly, this Court hereby **GRANTS** Defendant's motion for judgment on partial findings pursuant to Rule 52(c), **ENTERS** judgment in favor of Defendant as to all counts, and **CLOSES** this action.

The Government's motion to exceed page limits, [contained in Doc. 93], is hereby **GRANTED** *nunc pro tunc*, and the Government's trial brief is accepted as filed.

**IT IS SO ORDERED,** this 22nd day of April, 2010.

_____

WILLIS B. HUNT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

11